DICKERSON v. WESTERN UNION TELEGRAPH CO. ET AL.

[74 South. 779, In Banc.]

1. APPEAL AND ERROR. *Law of case.*
   Where a decision on a former appeal decided that the right of appeal was not barred by limitation, such decision becomes the law of the case and is binding on a retrial.

2. TELEGRAPHS AND TELEPHONES. *Contracts. Stipulations.*
   Under a stipulation in a telegraph blank declaring that the defendant company was made the agent of the sender without liability to forward any message, over the lines of any other company when necessary to reach its destination, where a mes-

sage was delivered to defendant for transmission from a point in Mississippi to a point in Alabama, such contract was governed by the laws of Mississippi and Alabama and where defendant had a line reaching from the sending point to the point of destination, it was not entitled to deliver the message to another telegraph company as the agent for the sender, but was itself liable for nontransmission.

3. TELEGRAPHS AND TELEPHONES. *Nondelivery. Damages. Punitive damages.*

Under the laws of both Mississippi and Alabama, the wilful and wanton neglect of a telegraph company in sending and delivering a message, authorizes the infliction of punitive damages but under the federal law, there can be no recovery of punitive damages, unless it is shown that the telegraph company either participated in the wrong of the servants or ratified the same.

4. COURTS. *State laws. Applicability.*

A state cannot impose, by its statute or decisions, liability that would extend to conduct beyond the territorial limits of the state.

5. COMMERCE. *Interstate messages. Statute. Construction.*

The Act Cong, Feb. 4, 1887, ch. 104, 24 Stat. 379, as amended by Act June 19, 1910, ch. 309, 36 Stat. 539, providing that all charges made for service rendered or to be rendered in the transportation of passengers or property and for the transmission of messages by telegraph, telephone or cable shall be just and reasonable, and every unjust and unreasonable charge for such service is prohibited and declared to be unlawful provided that messages by telephone, telegraph or cable subject to the provisions of the act may be classified into day, night, repeated, or unrepeated, letter, commercial, press, government, and such other classes as are just and reasonable, and different rates may be charged for the different classes, does not show that Congress has assumed control of interstate telephone, and telegraph business to the same extent that it has taken charge of common carriers by the Carmack Amendment (Act June 29, 1906, ch. 3591, section 7, paragraphs 11-12, 34 Stat. 395, U. S. Comp. Stat. 1913, section 8592, and the fact that Congress has not taken charge of the telegraph and telephone business to the same extent that it has taken charge of common carriers of persons and property and completely regulated the same, shows an intention to leave the state laws in force, as to them.

6. COMMERCE. *Statutes. Operation.*

The state law applies to telegraph and telephone business, even though it incidentally may affect interstate commerce, the Showers case, 112 Miss. 411, being by this opinion overruled.

APPEAL from the circuit court of Lee county.

HON. CLAUDE CLAYTON, Judge.

Suit by J. L. Dickerson against the Western Union Telegraph Company and the Postal Telegraph Cable Company. From a judgment for defendant, plaintiff appeals.

See also 111 Miss. 264.

Plaintiff J. L. Dickerson filed suit in the circuit court of Lee county against the Western Union Telegraph Company and Postal Telegraph Company for damages for the failure to deliver a message from E. S. Dickerson to J. L. Dickerson, sent from Tupelo, Miss., to Guin, Ala., said telegram bearing date of November 30, 1912, and reading as follows:

"J. L. Dickerson, in care of Mrs. Kirk, Guin, Ala. John Guyton fell dead today Bury tomorrow

"E. S. DICKERSON."

It was alleged that John Guyton was an uncle of plaintiff; that his home was at Cotton Plant, in the state of Mississippi; that the relation between the plaintiff and his uncle was very close, and they were fond of each other; that E. S. Dickerson, brother of the plaintiff, being at Tupelo, and hearing of said death on said day, delivered the above telegram to the Postal Telegraph & Cable Company at Tupelo, Miss., about five o'clock p. m. on said day; that the said company knew of the close relation between plaintiff and deceased, Guyton, and knew that the plaintiff would desire to attend the funeral of the said Guyton, and that the plaintiff was temporarily located at Guin; that the Postal Telegraph & Cable Company acceptel the telegram for delivery, and that the Postal Company had an office at both Tupelo, Miss., and Guin, Ala., and a connecting line between said points, but failed to send and deliver it as agreed and contracted; but, by some arrangement between the Postal Company and the Western Union Company, the nature of which is un-

known to the plaintiff, the Postal Company turned over the message to the Western Union Company to be sent and delivered, paying the Western Union Company in advance the fee required for such transmission for delivery, and that the Western Union Company owed plaintiff the duty of sending said message and delivering it to him. It is alleged that through the gross, willful, and wanton negligence of the said companies, and each of them, the message was not sent and delivered to the plaintiff on the day it should have been delivered, but through willful, wanton, and gross neglect was not delivered until noon the following day, December 1, 1912, at which time it was too late for the plaintiff to attend the funeral and burial of the said uncle, which took place on that day, and that he could not possibly reach the place where his uncle lived and died; that thereby the plaintiff was grieved and distressed in mind and body on account of being unable to attend the funeral and burial of his uncle. It is further alleged that if reasonable care had been used and exercised by the defendants, or either of them, the telegram could have been delivered, and that the failure to deliver same was the gross, wanton, and willful fault of defendants.

The Western Union Telegraph Company demurred to the declaration as against it, on the following grounds: First, the declaration is vague, uncertain, indefinite, and insufficient; second, it fails to state any cause of action whatever against the Western Union Telegraph Company; third, because if any one is liable to plaintiff, it is the Postal Telegraph & Cable Company and not the Western Union Telegraph Company; fourth, because the declaration shows that there was no contractual relation between the Western Union Telegraph Company and the plaintiff and that the Western Union Telegraph Companw is not liable to the plaintiff, but, if liable to any one, is liable to the Postal Telegraph & Cable Company. The court sustained the demurrer of

the Western Union Telegraph Company and dismissed the suit as to it.

The Postal Telegraph & Cable Company filed three special pleas in defense of the suit: First, that the Postal Telegraph & Cable Company was a common carrier by telegraph, under the laws of the United States, and that the message upon which suit was based was an interstate message from Tupelo, Miss., to Guin, Ala.; that said message was written upon a blank of the defendant company; that, among other stipulations, in the said sending blank it was therein provided that defendant company was not liable for damages or statutory penalty in any case where the claim is not presented in writing within sixty days after the message is filed with the company for transmission; that this stipulation is a valid and binding one in the contract of transmission of the message upon which suit is based, and that no claim was presented in writing to the defendant within sixty days after the message was received. This plea was demurred to by the plaintiff on the following grounds: First, because the plea is insufficient at law and presents no defense; second, that the laws of the United States have no application to this cause of action; that the same is wholly governed and controlled by the laws of the state of Alabama and the state of Mississippi, where the transaction took place.

Defendant's second special plea alleged that the defendant was a common carrier under the laws of the United States; that the message in suit was an interstate message, and was written on a regular sending blank of defendant, and, among other stipulations, in said sending blank it was provided that the defendant company "is hereby made agent of the sender, without liability, to forward any message over the lines of any other company when necessary to reach its destination"; that this stipulation is valid and binding, and was part of the contract of transmission of the message on which suit is based; that the company made diligent

effort to send said message over its own line to Guin, Ala., but was unable to do so by reason of the fact that the Guin office of the defendant company had then, at its regular time, closed for the day, and it therefore became necessary for the defendant company, in an earnest effort to get the message through to destination, to forward the same over the line of another company, which it did by delivering same to the Western Union Telegraph Company, paying the said company twenty-five cents for transmitting same, which was the same amount received by the defendant for sending the message.

This special plea was demurred to by the plaintiff on the following grounds: First, because said plea is insufficient in law, and presents no defense to the cause of action; second, because the laws of the United States have no application to this cause of action; that the same is wholly governed by the laws of Alabama and Mississippi, where the transaction took place; third, because the stipulation set out is against public policy and void, defendant not being permitted by law to contract against its own negligence.

Defendant's third special plea allages that the defendant is a common carrier under the laws of the United States, and that the message upon which the suit is based was an interstate one; that it was written on a regular sending blank of the company, and, among other stipulations, in the sending blank it is therein provided that the defendant company shall not be liable for nondelivery of any unrepeated message beyond the amount received for sending the same; that the stipulation was valid and binding as a part of the contract upon which the suit is based; that the message was an unrepeated message; and that the amount received by the defendant company for sending same was twenty-five cents, which amount the defendant now tenders and pays into court in satisfaction of the suit.

This plea was demurred to by the plaintiff: First, because it is insufficient in law, and presents no defense

to the cause of action; second, because the laws of the
United States have no application to this cause of
action, same being governed wholly by the laws of the
states of Alabama and Mississippi, where the transac-
tion took place; third, because, the stipulation set out in
said plea in reference to unrepeated messages is void
as being against public policy and violative of the
principle that the defendant cannot contract against its
own negligence.

The demurrers to each and all of these pleas were
presented together to the court below, and judgment
entered on each as an entirety. The demurrers being
overruled in each case, plaintiff declining to plead fur-
ther, the suit was dismissed, at his cost.

*W. D. & J. R. Anderson,* for appellant.

It will be contended in the supreme court that the
appeal so far as the Western Union Company is con-
cerned is barred by the limitation of two years, within
which time appeals must be taken.

The suit was dismissed against the Western Union
Company on the 16th day of May, 1913. But final
judgment as to the other defendant, the Postal Com-
pany, was not entered until the 3rd day of April, 1915.
In the final judgment dismissing the cause as to the
Postal Company, sixty days was granted within which
to perfect an appeal to the supreme court if desired.
However the petition for appeal, and the appeal bond
were not filed until August, 1915. On the 28th day
of August, 1915, opposing counsel signed a waiver of
the issuance and service of citation of the appeal. The
question is whether or not the statute of limitations
of two years began to run against the Western Union
Company on the 16th day of May, 1913, when the suit
was dismissed as to that Company? Was that such a
judgment under the law that the plaintiff was enabled
to appeal therefrom as soon as it was rendered. Was it

a final judgment as to the Western Union Company? We contend that it was not; that in order to appeal, the plaintiff had to wait until final judgment was entered against the other defendant the Postal Co. 2 Ruling Case Law, sec. 24, and cases in Notes; 2 Cyc., 588, cases in Note 84. 2 Cyc., 589, and cases in notes 86.

We insist that the court erred in sustaining the demurrer as we understood it on the fourth ground, which was that the plaintiff was not entitled to recover because the declaration showed no contractual relation existed between the company and the plaintiff, that if the Western Union Company was liable at all to anyone, it would be to the Postal Company. It is not the law that before one can hold a telegraph company liable he must have some contractual relations with them whatever, telegraph companies in Mississippi, and we believe in all of the states, are common carriers. They owe persons who have no contractual relations with them whatever the duty to faithfully and diligently perform the public services in which they are engaged; and especially is it true that where any such person is injured and damaged as the result of a tort by a telegraph company, the latter is liable. 37 Cyc., 1717-18-18-20 and notes p. 1720; *Hart, etc., v. Western Union*, 34 So. 361; *Western Union v. Watson*, 82 Miss. 101, 33 So. 76; *Western Union v. Hiller*, 93 Miss. 658, 47 So. 377; *Steinberger v. Western Union*, 52 So. 691; *Western Union v. Watkins*, 63 So. 94; *Postal Co. v. Mills*, 82 Miss. 733, 35 So. 190; *Majorick v. Western Union*, 79 Miss. 632, 31 So. 206; *Singleur v. Western Union*, 72 Miss. 1030, 18 So. 425; *Western Union v. Allen*, 66 Miss. 549, 6 So. 461.

So far as we know the authorities everywhere hold that the sendee of a message although he has no contractual relation with the telegraph company may sue for a tort committed against him. That is exactly the kind of suit this is. So if we are right about this, the court below clearly erred in holding that the Western Union

Company owed the plaintiff no duty, and was not liable to him for the alleged tort.

As to the postal telegraph company, First: The court below decided this cause in favor of the Postal Company on the authority of *Western Union* v. *Brown,* 234 U. S. 542, 58 Law, 1457. The decision in the court below was based on the theory that because the Postal Company was engaged in the interstate commerce, and because this was an interstate message, the questions involved were controlled by the Federal decisions, and not by the laws of either the state of Mississippi or the state of Alabama; that under the federal decisions the matter was set up by way of defence in the three special pleas were good, while they would not be under the laws of either Alabama or Mississippi.

We respectfully submit that *Western Union* v. *Brown,* *supra,* has no application in the world to this case. Here were the facts in that case: South Carolina had a mental anguish statute. A telegram was sent by a party in South Carolina to a party in Washington, D. C. When it reached its destination the tort was committed which resulted in a suit in the state of South Carolina by the sendee, claiming damages for mental anguish under the statute of South Carolina. The supreme court of the United States held that the telegraph company was not liable on two grounds: a. That the law of the place where the tort was committed governed the District of Columbia, and there being no statute there like the South Carolina statute, there was no liability. b. That it was an attempt by the state of South Carolina by this statute to regulate commerce among the states; that the South Carolina statute attempted to impose a burden on the telegraph company in South Carolina for a tort committed by it in another jurisdiction; and cited in support this proposition: *Western Union* v. *Pendelton,* 122 U. S. 347; *Western Union* v. *Commercial Mills Co.,* 218 U. S. 406, 54 L. Ed. 1088,

This suit is not based on any Mississippi statute, or any announcement of the common law by the courts of Mississippi by which it sought to burden the telegraph company any more than it would be burdened by the laws of the state of Alabama, and as for that by the laws of any other state of the ʿUnion. This is a suit for damages for a wilful tort committed in either Alabama or Mississippi, it does not make any difference which, because the laws applicable are the same in each of these states. *Crowley* v. *Western Union,* 158 Ala. 583 48 So. 381; *Wesern Union* v. *Seed,* 115 Ala. 670, 22 So. 474; *Western Union* v. *Hiller,* 93 Miss. 658, 47 So. 377; *Western Union* v. *Watson,* 82 Miss. 101, 33 So. 76. Alabama goes still further than Mississippi. In our judgment the case of *Western Union* v. *Mills Co.,* 218 U. S. 406, 54 Law Ed. 1088, is absolutely conclusive of the questions involved in this case.

The Carmack Amendment as argued in the court be-low has nothing on earth to do with this question. That only applies to interstate common carriers of passengers and freight. The law stands now just like it did when the supreme court of the United States decided the *Commercial Mills.ʾ Co. Case,* 37 Cyc., 1091; *Western Union* v. *Henderson,* 89 Ala. 510, 7 So. 419.

It is set up in the second plea that the telegraph blank contained a stipulation that the defendant company "Is hereby made the agent of the sender without liabili-ty to forward any message over the lines of any other company when necessary to reach its destination." And that therefore because the Postal Company turned the message over to the Western Union, there was no liability as to the Postal Company.

We contend that this stipulation has no application to the case made by the amended declaration and these pleas, because they show that both these companies had officers and agents both at Tupelo and Guin, Alabama; that both had lines running from the former to the lat-ter place. The Postal Company did not hand this

message over to the Western Union as a connecting line or a forwarding company, which was the state of affairs contemplated by this stipulation. The declaration and these pleas show that the Postal Company turned it over to the Western Union because the Postal found its office at Guin, Alabama had been closed, and that by virtue of some arrangement between the two telegraph companies, it was the duty of the Western Union Company to transmit and deliver the telegram. The stipulation in question, we contend, does not in terms nor by implication, cover any such condition.

But even if we are mistaken about this, such a stipulation does not protect the original transmitting company against its own negligence or affect the liability of the latter company for its negligence after the message had reached its hands. 37 Cyc. 1692-1693. The declaration in this case charges negligence against each and both of the defendants which is distinctly and clearly set out.

The third plea sets up non-liability because of the unrepeated message stipulation in the telegram blank, this being an unrepeated message. It is true, as contended by opposing counsel, that this stipulation is upheld by the federal court, while it is overturned by the supreme courts of Mississippi and Alabama. But the point we make is that it has not any application to this cause, because the unrepeated clause in a telegraph blank is for the purpose of insuring accuracy in the wording of the message itself and not promptness in transmitting and delivering. 37 Cyc., 1684-85-86-87.

It will be seen from the notes of the above citation that the authorities are divided on this question, but on page 1687, 37 Cyc. it will be observed that Alabama, Colorado, Indiana, West Virginia, Kentucky, and the Federal court have held to that view, not including the supreme court of the United States because we do not find that court has passed on the question. It seems to us that it would be utterably unreasonable to give

this stipulation any force where the only complaint was that there had been a complete failure of transmission and delivery in any form within a reasonable time. There is no error charged in the transmission clause; that is in the language of the message.

However as we understand the law these stipulations of non-liability for an unrepeated message, have no binding force where the default is the result of willful misconduct or gross negligence. 37 Cyc., 1684-1685-1686, and note 6, p. 1684; also note 12, p. 1686.

As we view the authorities, this question is settled by the state and federal authorities including the supreme court of the United States. *Primrose* v. *W. U. Tel. Co.,* 154 U. S. 1, 38 L. Ed. 883. Respectfully submitted.

*Flowers, Brown Chambers & Cooper,* for appellee.

In reply to the brief of appellant in this cause we see nothing therein which in any manner supports an argument that the amendatory act set out in our printed brief does not remove the interstate business of telegraph companies from regulation by states.

Counsel's main contention is that there is nothing in the act broad enough to cover this matter. But we think that the act takes over for the first time the interstate business of telegraph companies and provides that its rates shall be reasonable. But this act expressly provides that the companies affected may classify their messages into repeated, unrepeated, night, letters, commercial and other messages and charge a different rate therefor.

It is very true that this is a matter incident to the establishment of rates. But we ask counsel to answer this question. What difference is there between a repeated and unrepeated message?

We ask counsel if the difference is not in the liability assumed by the telegraph company in the event of de-

lay or non-delivery of the message? There could be no other distinction. Of course the rates vary but the essential difference is in the liability assumed by the telegraph company. And the rates charged are the rates based on the liability as assumed.

What significance does repeated and unrepeated have to the ordinary mind? The law books of the land are simply spotted with cases dealing with the repeated and unrepeated messages. The supreme court of the United States has decided several cases on this feature.

We ask counsel again that if Congress desired to take over for the purposes of rates alone and in the act of taking over this character of business specifically declared that it might have repeated and unrepeated messages and base its rates thereon if this court would hold that the diminished liability in the unrepeated message is illegal, what would be the effect of interstate regulation?

Counsel cites that effect on the Carmack Amendment. He states that it did four things: Required the issuance of a bill of lading; made the initial carrier liable even though the connecting carrier were guilty of the negligence; Made it liable for any loss, damage or injury and provided that the carrier could not stipulate against its own negligence.

Counsel will find that repeated and unrepeated mean as much in the statute because Congress there adopted with their full significance words which have become a part of the language of our people. They are used every day; used in the opinions of courts and carry with it only two ideas, a difference in rates and a difference in the liability of the telegraph company. Nearly every court that has had occasion to pass upon this question has upheld our contention and we are advised that only recently the supreme court of Minnesota has reached the same conclusion. We have not, however, read a copy of the opinion.

ETHRIDGE, J.; delivered the opinion of the court.

(After stating the facts as above). At the March term, 1916, a motion was made in this case by the Western Union Telegraph Company to dismiss as to it, claiming that any right of appeal of appellant was barred by the statute of limitations, which motion was overruled by the court in an opinion (111 Miss. 264, 71 So. 385), which is the law in so far as the limitation question involved in this appeal is concerned. The question as to whether or not the Western Union would be liable would depend on whether the clause in the special plea of the Postal Company, in which it alleged that it procured or contracted with the Western Union Company as the agent of appellant or plaintiff, is valid. As we reach the conclusion that this clause in the contract was not valid, on our theory that the local state laws of Mississippi and Alabama would govern this case, and not the laws of the United States, and that the clause would apply only where the Postal Company have no line from the sending office to the receiving office, we decide that the Western Union Company is not liable to the plaintiff, Dickerson, but its liability, if any, is to the Postal Company; and on this branch of the case the action of the lower court is affirmed.

The question of liability between appellant and the Postal Company presented by the record depend upon the question as to whether or not the act of Congress of June 18, 1910, has the effect of suspending and displacing state regulations and laws with reference to the telegraph business. It is argued by the appellant that the act of 1910 did not undertake to regulate the duties and liabilities between the telegraph companies and their patrons and customers, but that it only undertakes to deal with rates, and that Congress had not, therefore, taken full control of the telegraph business, and that consequently the laws of the state apply to transactions of the kind presented by this record. Un-

der the law of both the states of Mississippi and Alabama the willful and wanton neglect of the telegraph company in sending and delivering a message authorizes punitive damages. It follows that the matters pleaded in defense of this suit do not present a defense, with the exception, possibly, of the sixty day time limit for filing a claim, but the record shows the suit was filed within the sixty days, and that question is not presented for decision here.

The appellant concedes that if the federal law prevails and applies to this case there can be no recovery of punitive damages unless it is shown that the master either participated in the wrong of the servant or afterwards ratified it and, further, the appellant could not establish liability by showing that the master participated in the wrong, or ratified it, as construed by the federal courts, after it was done. The question must turn upon whether the state or federal law governs the liability in this case.

The act to regulate commerce was amended by the act of 1910 so as to make telegraph companies common carriers, and provides that:

"All charges made for  . .  service rendered or to be rendered in the transportation of passengers or property and for transmission of messages by telegraph, telephone, or cable, as aforesaid, or in connection therewith, shall be just and reasonable; and every unjust and unreasonable charge for such service or any part thereof is prohibited and declared to be unlawful; Provided, that messages by telegraph, telephone, or cable, subject to the provisions of this act, may be classified into day, night, repeated, unrepeated, letter, commercial, press, goverment, and such other classes as are just and reasonable, and different rates may be charged for the different classes of messages."

The contention of appellee is that by this provision Congress has taken charge of the telegraph and telephone business to the same extent that it has taken

114 Miss.—9

charge of common carriers of persons and property under the Carmack Amendment. The Carmack Amendment is as follows:

"That any common carrier, railroad, or transportation company receiving property for transportation from a point in one state .to a point in another state shall issue a receipt or bill of lading therefore and shall be liable to the lawful holder thereof for any loss, damage, or injury to such property caused by it or by any common carrier, railroad, or transportation company to which such property may be delivered or over whose line or lines such property may pass, and no contract, receipt, rule, or regulation shall exempt such common carrier, railroad, or transportation company from the liability hereby imposed; Provided, that nothing in this section shall deprive any holder of such receipt or bill of lading· of any remedy or right of action which he has under existing law.

"That the common carrier, railroad, or transportation company issuing such receipt or bill of lading shall be entitled to recover from the common carrier, railroad, or transportation company on whose line the loss, damage, or injury shall have been sustained, the amount of such loss, damage, or injury as it may be required to pay to the owners of such property, as may be evidenced by any receipt, judgment, or transcript thereof."

It is not contended by the appellees in the argument here that this specific provision applies to telephone and telegraph companies, but that the provision of the statute above quoted, on common carriers, is in effect, as broad and comprehensive as the Carmack Amendment, and that it has the necessary effect of the federal government having undertaken full control of this business, and that, as to interstate messages, state laws and decisions are inapplicable, but that the liability is entirely controlled by the federal laws and decisions. It seems to us that the act of 1910 is no broader, when applied to telegraph and telephone companies, than the

original act to regulate commerce prior to the Carmack
Amendment was to the railroads, and that the same
rules would apply to the telegraph business under the
present statute as applied to the railroads under the
statute prior to the Carmack Amendment. We are a-
ware that the courts of several states, and some of the
federal courts, have decided in accordance with the
contention of appellee and that this court, in the case
of *Western Union Telegraph Co.* v. *Showers,* 73 So. 276,
followed those decisions in holding that the act of
Congress had superseded state laws and decision.   In
the present case, these authorities have been reviewed
and discussed in the arguments, and we have care-
fully examined them, and have reached the conclusion
that these decisions have misconceived the effect of the
act of 1910, and have misconstrued the effect and pur-
port of the decision of the United States supreme court
in *Western Union Telegraph Co.* v. *Brown,* 234 U. S.
542, 34 Sup. Ct. 955, 58 L. Ed. 1457, and *Adams Express
Co.* v. *Cronlinger,* 226 U. S. 491, 33 Sup. Ct. 148, 57 L.
Ed. 314, 44 L. R. A. (N. S.) 257.   In *Western Union
Co.* v. *Brown, supra,* the cause of action sued on was
brought under a statute of the state of South Carolina
(Civil Code of South Carolina, 1902, section 2223), which
imposed liability for the failure to send and deliver
telegrams.   As construed by the supreme court of that
state, it was held that the telegraph company was liable
on a message sent from South Carolina to Washington,
D. C., where the cause of action arose, because of the
negligence of the telegraph company in failing to de-
liver promptly the telegram after its receipt in Washing-
ton.   The federal supreme court in deciding this case
says:

"Whatever variations of opinion and practice there
may have been, it is established as the law of this court
that when a person recovers in one jurisdiction for a
tort committed in another, he does so on the ground
of an obligation incurred at the place of the tort that

accompanies the person of the defendant elsewhere, and that is not only the ground but the measure, of the maximum recovery.  .  .  .  The injustice of imposing a greater liability than that created by the law governing the conduct of the parties at the time of the act or ommission complained of is obvious; and when a state attempts in this manner to affect conduct outside its jurisdiction or the consequences of such conduct, and to infringe upon the power of the United States, it must fail.  The principle would be illustrated by supposing a direct clash between the state and federal statutes; but it is the same whenever the state undertakes to go beyond its jurisdiction into territory where the United States has exclusive control."

The court then proceeds to say:

"What we have said is enough to dispose of the case.  But the act also is objectionable in its aspect of an attempt to regulate commerce among the states. That is, as construed, it attempts to determine the conduct required of the telegraph company in transmitting a message from one state to another or to this district by determining the consequences of not pursuing such conduct, and in that way encounters *Western U. T. Co.* v. *Pendelton.* 122 U. S. 347, 7 Sup. Ct. 1126, 30 L. Ed. 1187, 1 Interest. Com. R. 306, a decision in no way qualified by *Western U. T. Co.* v. *Commercial Mill. Co.,* 218 U. S. 406, 31 Sup. Ct. 59, 54 L. Ed. 1088, 36 L. R. A. (N. S.) 220, 21 Ann. Cas. 815."

In other words, the supreme court merely held that a state cannot impose, by its statutes or decisions, liability that would extend to conduct beyond the territorial limits of the state.  It will readily be seen that if each state could extend its statutes beyond its own borders and impress liability upon a person for acts done outside of its territorial jurisdiction, there would be the utmost confusion.  But the federal supreme court, in the case quoted above, did not decide, and, we apprehend, will not decide, that a state cannot enforce

the performance of duties within its borders even as to interstate transactions, until Congress shall have provided a rule of liability. In the note to the Lawyers' Edition report of this case, the learned editor of the report says:

"Had the default occured in South Carolina, however, a different result must have been reached, under the doctrine of *Western U. T. Co.* v. *Crovo,* 220 U. S. 364, 31 Sup. Ct. 399, 55 L. Ed. 498, where a state statute, under which a penalty is incurred by a telegraph company which negligently fails to transmit within the state as promptly as practicable a message received at an office in the state for transmission to a person in another state, was held to be a valid exercise of the police power of the state, in the absence of any legislation by Congress on the subject. In *Ivy* v. *Western U. T. Co.* [(C. C.) 165 Fed. 371] *supra* the action was based upon a failure to deliver a message sent to a point in Indiana from a place in Arkansas, in which latter state the suit was brought. The court applied the Arkansas mental anguish statute, and held that, as so applied, the statute, incidentally affecting contracts for the transmission of interstate messages, was not an unconstitutional regulation of interstate commerce."

In *Western Union Telegraph Co.* v. *Crovo,* 220 U. S. 364, 31 Sup. Ct. 399, 55 L. Ed. 498, above referred to the court, discussing the proposition of imposing penalties upon interstate messages by state laws, said:

"The only question for decision, is whether a statute of the state of Virginia which imposes a penalty for the failure to transmit a dispatch received at an office of the company in the state for transmission to a person in another state is a valid exercise of the power of the state, the delay occuring in the state. That companies engaged in the telegraph business, whose lines extend from one state to another, are engaged in interstate commerce, and that messages passing from one

state to another constitute such commerce, is indisputable. Such companies and such messages come, therefore, under the regulating power of Congress. It follows, then, that if this statute as applied in the state court is to be construed as a regulation of commerce between the states, it is in excess of the power of the state. . . . No attempt is here made to enforce the provisions of the state statute beyond the limits of the state, and no other state could, by legislative enactment, affect in any degree the duty of the company in relation to the delivery of messages within the limits of the state of Georgia. No confusion, therefore, could be expected in carrying out within the limits of that state the provisions of the statute. It is true it provides a penalty for a violation of its terms and permits a recovery of the amount thereof irrespective of the question whether any actual damages have been sustained by the individual who brings the suit; but that is only a matter in aid of the performance of the general duty owed by the company. It is not a regulation of commerce, but a provision which only incidentally affects it. . . . 'While it is vitally important that commerce between the states should be unembarrassed by vexatious state regulations regarding it, yet, on the other hand, there are many occasions where the police power of the state can be properly exercised to insure a faithful prompt performance of duty within the limits of the state upon the part of those who are engaged in interstate commerce. We think the statute in question is one of that class, and in the absence of any legislature by Congress the statute is a valid exercise of the power of the state over the subject.' "

In the case of *Adams Express Co.* v. *Croninger,* 226 U. S. 491, 33 Sup. Ct. 148, 57 L. Ed. 314, 44 L. R. A. (N. S.) 257, which involved a question as to whether or not Congress had taken over full control of railroad transportation under the Carmack Amendment, the federal supreme court, in analyzing the act as applied to

railroad companies contained in the Carmack Amendment above referred to, says:

"The significant and dominating features of that amendments are these:

"First, it affirmatively requires the initial carrier to issue 'a receipt or bill of lading therefor,' when it receives property for transportation from a point in one state to a point in another."

"Second. Such initial carrier is made 'liable to the lawful holder thereof for any loss, damage, or injury to such property caused by it.'

"Third. It is also made liable for any loss, damage, or injury to such property caused by 'any common carrier, railroad or transportation company to which such property may be delivered or over whose line or lines such property may pass.'

"Fourth. It affirmatively declares that 'no contract, receipt, rule or regulation shall exempt such common carrier, railroad, or transportation company from the liability hereby imposed.'

"Prior to that amendment the rule of carriers liability, for an interstate shipment of property, as enforced in both federal and state courts, was either that of the general common law as declared by this court and enforced in the federal courts throughout the United States (*Hart v. Pennsylvania R. Co.*, 112 U. S. 331, 5 Sup. Ct. 151, 28 L. Ed. 717), or that determined by the supposed public policy of a particular state (*Pennsylvania R. Co.* v. *Hughes*, 191 U. S. 477, 24 Sup. Ct. 132, 48 L. Ed. 268), or that prescribed by statute law of a particular state (*Chicago, M. & St. P. R. Co.* v. *Solan.* 169 U. S. 133, 18 Sup. Ct. 289, 42 L. Ed. 688). . . .

"That the legislature supersedes all the regulations and policies of a particular state upon the same subject results from its general character. It embraces the subject of the liability of the carrier under a bill of lading which he must issue, and limits his power to exempt himself by rule, regulation, or contract.

Almost every detail of the subject is covered so completely that there can be no rational doubt but that Congress intended to take possession of the subject and spersede all state regulation with reference to it. Only the silence of Congress authorized the exercise of the police power of the state upon the subject of such contracts. But when Congress acted in such a way as to manifest a purpose to exercise its conceded authority, the regulation power of the state ceased to exist. *Northern P. R. Co.* v. *Washington.* 222 U. S. 370, 32 Sup. Ct. 160, 56 L. Ed. 237; *Southern R. Co.* v. *Reid,* 222 U. S. 424, 32 Sup. Ct. 140, 56 L. Ed. 257; Second Employers' Liability Cases, *Mondou* v. *New York, N. H. & H. R. Co.,* 223 U. S. 1, 32 Sup. Ct. 169, 56 L. Ed. 327, 38 L. R. A. (N. S.) 44.''

It will be seen that the Carmack Amendment radically changed the obligations, liabilities, and duties of a common carrier in transportation as existing prior to 1906, and as cited by the court in the above quotation.

On page 505 of 226 U. S., page 152 of 33 Sup. Ct. page 320 of 57 L. Ed. (44 L. R. A. [N. S.] 257), of the above case, the court says:

''That the legislature supersedes all the regulations and policies of a particular state upon the same subject results from its general character. It embraces the subject of the liability of the carrier under a bill of lading which he must issue, and limits his power to exempt himself by rule, regulation, or contract. Almost every detail of the subject is covered so completely that there can be no rational doubt but that Congress intended to take possession of the subject and supersede all state regulation with reference to it. Only the silence of Congress authorized the exercise of the police power of the state upon the subject of such contracts. But when Congress acted in such a way as to manifest a purpose to exercise its conceded authority, the regulating power of the state ceased to exist.''

In the case of *Pennsylvania Railroad Co.* v. *Hughes,* referred to in the *Croninger Case, supra,* the court discussing the right of a state to impose regulations under the federal act to regulate commerce as it then existed, on page 486 of 191 U. S., page 134 of 24 Sup. Ct., on page 271 of 48 L. Ed., used the following language:

"In *Grogan* v. *Adams Exp. Co.,* 114 Pa. 523, 7 Atl. 134, 60 Am. Rep. 360, the supreme court of Pennsylvania expressly declined to follow the rule laid down in *Hart* v. *Pennsylvania Railroad Company,* adhering to its own declared doctrine, denying the right of a common carrier to thus limit its liabilities for injuries resulting from negligence.   The cases are numerous and conflicting, different rules prevailing in different states.   The federal courts in cases of which they have jurisdiction will doubtless continue to follow the rule of the Hart Case, but the highest court of Pennsylvania may administer the common law according to its understanding and interpretation of it, being only amenable to review in the federal supreme court where some right, title, immunity, or privilege, the creation of the federal power, has been asserted and denied. *Bethell* v. *Demaret,* 10 Wall. 537, 19 L. Ed. 1007; *Delmas* v. *Merchants' Mut. Ins. Co.,* 14 Wall. 666, 20 L. Ed. 759; *New York L. Ins. Co.* v. *Hendren,* 92 U. S. 287, 23 L. Ed. 709; *United States* v. *Thompson,* 93 U. S. 586, 23 L. Ed. 982.

"In the supreme court of Pennsylvania a further assignment of error was made as follows: 'III The learned court below erred in entering judgment in conflict with the act of Congress of February 4, 1887, entitled "An act to regulate commerce." Section 1 of said act clearly provides that where the transportation is from one state to another, under a through bill of lading, its provisions shall be carried out, unless it be in conflict with a statute of the state in which it may be performed, or in conflict with the policy of the United States as laid

down in the federal courts, and that, as the contract was valid in the place where made, and, as there is no statute in Pennsylvania prohibitory of an agreed valuation to establish a rate, and as it is consistent with the policy of the United States as declared by the federal courts, the judgment should have been for the valuation mentioned in the contract.'

"Of this assignment of error, Mr Justice Potter, delivering the opinion of the supreme court of Pennsylvania, said: 'The third assignment of error suggests that the entry of judgment is in conflict with the Interstate Commerce Act of Congress. This seems to be an afterthought, as there is no indication in the record that this question was raised or considered in the court below. It is not apparent how the act can have any application to this case. It contains nothing bearing upon the validity of a contract limiting the liability of a railroad for loss or injury caused by negligence. The object of the act seems to be to secure continuous carriage and uniform rates, and to compel the furnishing of equal facilities. We cannot see that the entry of judgment in this case interferes in any way with the legitimate exercise of interstate commerce.'

"Upon the authority of *Missouri, K. & T. R. Co.* v. *Elliott,* 184 U. S. 533, 22 Sup. Ct. 446, 46 L. Ed. 674, it may be admitted that the question of the decision of the state court, being in contravention of the legislation of Congress to regulate intertsate commerce, was sufficiently made, and the adverse decision to the party claiming the benefit of that act gives rise to the right of review here. In refusing to limit the recovery to the valuation agreed upon, did the state court deny to the company a right or privilege secured by the interstate commerce law? It may be assumed that under the broad power conferred upon Congress over interstate commerce as defined in repeated decisions of this court, it would be lawful for that body to make provision as to contracts for interstate carriage, permitting the carrier

to limit its liability to a particular sum in consideration of lower freight rates for transportation. But upon examination of the terms of the law relied upon we fail to find any such provision therein the sections of the interstate commerce law relied upon by the learned counsel for plaintiff in error (24 Stat. at L. 379—82, c. 104, U. S. Comp. Stat. 1901, pp. 3154—3159; 25 Stat. at L. 855, c. 382, U. S. Comp. Stat. 1901, p. 3158) provide for equal facilities to shippers for the interchange of traffic; for nondiscrimination in freight rates; for keeping schedules of rates open to public inspection; for posting the same in public places, with certain particulars as to charges, rules, and regulations; for the publication of joint tariff rates for continuous transportation over one or more lines to be made public when directed by the Interstate Commerce Commission; against advances in joint tariff rates except after ten days' notice to the Commission; against reduction of joint tariff rates except after three days like notice; making it unlawful for any party to a joint tariff to receive or demand a greater or less conpensation for the transportation of property between points as to which a joint tariff is made different than is specified in the schedule filed with the commission; giving remedies for the enforcement of the foregoing provisions, and providing penalties for their violation; making it unlawful to prevent continuous carriage, and providing that no break of bulk, stoppage, or interruption by the carrier, unless made in good faith for some necessary purpose, without intention to evade the act, shall prevent the carriage of freights from being treated as one continuous carriage from the place of shipment to the place of destination.

"While under these provisions it may be said that Congress has made it obligatory to provide proper facilities for interstate carriage of freight, and has prevented carriers from obstructing continuous shipments on interstate lines, we look in vain for any regu-

lation of the matter here in controversy. There is no sanction of agreements of this character limiting liability to stipulated valuation, and, until Congress shall legislate upon it, is there any valid objection to the state enforcing its own regulations upon the subject, although it may, to this extent, indirectly affect interstate commerce contracts of carriage?

"It is well settled that the state may make valid enactments in the exercise of its legislative power to promote the welfare and convenience of its citizens, although in their operation they may have an effect upon interstate traffic. . . .

"The case of *Chicago, M. & St. P. R. Co.* v. *Solan,* 169 U. S. 133, 18 Sup. Ct. 289, 42 L. Ed. 688, is, in our opinion, virtually decisive of the question made upon this branch of the case. In that case cattle were loaded at Rock Valley, Iowa, to be shipped to Chicago. The contract, as here, was for interstate transportation. An injury happened to the drover in charge of the cattle in Iowa, due to the negligence of the transporting company. The shipper had signed a contract providing: 'That the company shall in no event be liable to the owner or person in charge of said stock for any injury to his person in any amount exceeding the sum of five hundred dollars.' The company averred and offered to prove that, in view of this limited liability, it had agreed to transport the cattle at a reduced rate. The Statute of Iowa provided: 'No contract, receipt, rule or regulation shall exempt any corporation engaged in transporting persons or property by railway from liability of a common carrier, or carrier of passengers, which would exist had no contract, receipt, rule or regulation been made or entered into.' Iowa Code of 1873, section 1308. The trial court charged that the limitation contained in the contract was void, and a verdict of one thousand dollars damages was returned. A judgment on the verdict was affirmed in the supreme court of Iowa. In delivering the opinion of this court Mr. Jus-

tice Gray said (169 U. S. p. 137 [18 Sup. Ct. 291, 42 L. Ed. 688]) : 'A carrier exercising his calling within a particular state, although engaged in the business of the interstate commerce, is answerable, according to the law of the state, for acts of nonfeasance or of misfeasance committed within its limits. If he fails to deliver goods to the proper consignee at the right time and place, or if by negligence in transportation he inflicts injury upon the person of a passenger brought from another state, the right of action for the consequent damage is given by the local law. It is equally within the power of the state to prescribe the safeguards and precautions foreseen to be necessary and proper to prevent by anticipation those wrongs and injuries which, after they have been inflicted, the state has the power to redress and to punish. The rules prescribed for the construction of railroads, and for their management and operation, designed to protect persons and property, otherwise endangered by their use, are strictly within the scope of the local law. They are not, in themselves, regulations of interstate commerce, although they control, in some degree, the conduct and the liability of those engaged in such commerce. So long as Congress has not legislated upon the particular subject, they are rather to be regarded as legislation in aid of such commerce, and as a rightful exercise of the police power of the state to regulate the relative rights and duties of all persons and corporations within its limits. . .

The statute now in question, so far as it concerns liability for injuries happening within the state of Iowa, which is the only matter presented for decision in this case, clearly comes within the same principles. It is in no just sense a regulation of commerce. It does not undertake to impose any tax upon the company, or to restrict the persons or things to be carried, or to regulate the rate of tolls, fares, or freight. Its whole object and effect are to make it more sure that railroad companies shall perform the duty, resting upon them by

virtue of their employment as common carriers, to use the utmost care and diligence in the transportation of passengers and goods.' ' '

Reverting to the act of 1910, set out above, what statute of the United States regulates liabilities, rights, and duties between the telegraph company and its patrons? It is elementary that there is no federal common law, and that the powers of the federal government are delegated ones, and it must, by statute, prescribe the rules and regulations of a subject committed to its care. *United States* v. *Hudson,* 7 Cranch, 32, 3 L. Ed. 259; Hughes Federal Jurisdiction and Procedure, pp. 5, 6, and 22; *Wheaton* v. *Peters,* 8 Pet. 591, 8 L. Ed. 1055; *Smith* v. *Alabama,* 124 U. S. 465 [8 Sup. Ct. 564] 31 L. Ed. 508. The federal government, in cases where Congress has not acted. Enforces rights in matters brought before it within its jurisdiction according to the laws of the states, but does not, in all cases, follow the state courts' interpretations of the common law, but uses its own judgment and decides for itself what the common law is. In some of the decisions this would create confusion, unless we bear in mind that the federal government is a government of delegated powers, and that it has never, by statute, adopted the common law as it existed in England or in any particular jurisdiction. Inasmuch as each state is sovereign, and adopts the common law, modified by its local conditions and environment, it would seem that the state court ought to be best able to judge of the common law in matters coming before it or arising within its territory. Certainly the rights, duties, and obligations imposed by the act of 1910, whatever they may be, must be enforced according to the law of the state where the cause of action originated, as Congress has not provided specifically what are those duties and rights, nor provided how and in what courts they should be exercised and enforced.

The government of the United States and the governments of the several states, being independent and interdependent, neither of them having full governmental functions, and being composed, within the limits of a state, of the same citizens, it is of the utmost importance that rights be enforced; and, where the federal government has supreme power, but has not asserted it to its full extent, the state laws should supplement .the federal law so as to secure to all citizens of the country some remedy for wrongs and some plan for the enforcement of rights.   And until necessarily there is a conflict, courts should not construe the law so as to deprive a person of his rights of property or person in the enforcement of obligations due him.   We think the sound rule is to hold that the telegraph and telephone business now stands practically on the same plane of liability and obligation as railroads stood prior to the Carmack Amendment.

We have examined the authorities which take the contrary view, including *Western Union Telegraph Co.* v. *Showers,* in this state, and reach the conclusion that they have announced the wrong rule, and until the federal supreme court, which has final authority in this matter, shall decide otherwise, we hold that the state law applies to the telegraph and telephone business, even though it incidentally may affect interstate commerce, and the Showers Case is hereby overruled.

The court below having reached the contrary conclusion, the judgment is reversed, and the cause remanded.

*Reversed and remained.*

STEVENS, J., dissents.

SYKES, J., took no part.